

**IT IS ORDERED as set forth below:**

**Date: March 22, 2017**

_____

**Barbara Ellis-Monro
U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN RE: <br><br> STEVEN MARKOWITZ and <br> MARILYN MARKOWITZ, <br><br> Debtors. | CASE NO. 14-68061-BEM <br><br> CHAPTER 7 |
| JORDAN E. LUBIN, <br><br> Plaintiff, <br><br> v. <br><br> JASON MARKOWITZ and <br> ADAM MARKOWITZ, <br><br> Defendants. | ADVERSARY PROCEEDING NO. <br> 16-5221-BEM |

## O R D E R

This matter is before the Court on Jason Markowitz ("Jason") and Adam Markowitz's ("Adam" and together with Jason, "Defendants") Motion to Dismiss Plaintiff's

Amended and Restated Complaint (the "Motion") [Doc. 17]. Jordan Lubin ("Plaintiff"), as Chapter 7 Trustee for the bankruptcy estates of Steven Markowitz ("Steven") and Marilyn Markowitz ("Marilyn" and together with Steven, "Debtors") filed a response to the Motion (the "Response") [Doc. 24]. Defendants are Debtors' sons. [Doc. 13 ¶ 8].

Plaintiff initiated this adversary proceeding by filing a Complaint on September 15, 2016 [Doc. 1]. On November 23, 2016 Plaintiff filed an Amended and Restated Complaint (the "Amended Complaint") in which Plaintiff sought to avoid transfers of funds from Debtors to Defendants [Doc. 13]. The Amended Complaint raised, in relevant part: (Count 1) Claim to Avoid the CD Account 1 Transfer under O.C.G.A. § 18-2-74, or Other Applicable Law, and 11 U.S.C. § 544; (Count 5) Claim to Avoid the CD Account 2 Transfer under O.C.G.A. § 18-2-74, or Other Applicable Law, and 11 U.S.C. § 544, (Count 9) Claim to Avoid the Jason Transfers under O.C.G.A. § 18-2-74, or Other Applicable Law, and 11 U.S.C. § 544; and (Count 12) Claim to Avoid the Adam Transfers under O.C.G.A. § 18-2-74, or Other Applicable Law, and 11 U.S.C. § 544.

In the Motion Defendants seek dismissal of Counts 1, 5, 9 and 12 because the transfers at issue in each of these counts were made more than four years prior to the 2014 bankruptcy filing by the Debtors. Defendants argue that the statute of limitations contained in O.C.G.A. § 18-2-79 causes Plaintiff to be unable to state a claim upon which relief can be granted such that the Amended Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

**I.    ALLEGED FACTS**

On December 13, 2006, Steven submitted an unsigned personal financial statement to The Shoppes at Monarch ("Creditor") to open a retail coffee shop to be known as

2

"It's A Grind." [Doc. 13, ¶¶ 15, 16]. On January 19, 2007, Debtors formed the corporate entity Alilyn & Jacklp, Inc. to operate "It's A Grind." [Id. ¶ 19]. On January 31, 2007, Alilyn & Jacklp, Inc. entered into a ten year lease with Creditor on which Debtors executed a personal guaranty (the "Lease"). [Id. ¶¶ 20, 21, Ex. B].

Marilyn's father, Ben Weisman, passed away on September 21, 2008 leaving assets in the amount of $1,569,087.00 (the "Weisman Estate"). [Id. ¶¶ 22, 24, Ex. C]. The majority of the Weisman Estate's assets were deposited into a single bank account identified as "Wachovia High Performance Money Market, Account Number XXX-1634, Account Holders, Steven Markowitz and Marilyn Markowitz" (the "Estate Account") which was opened on October 30, 2008. [Id. ¶¶ 32, 33]. The vast majority of the funds deposited in the Estate Account were distributed prior to July 8, 2009. [Id. ¶¶ 33, 34].

In December, 2008 Steven sent Creditor three emails in which he claimed that "It's A Grind" and Debtors were having financial difficulties and indicated that bankruptcy was a significant possibility, if not unavoidable. [Id. ¶ 30, Ex. D].

**The Alleged Transfers**

On December 11, 2008, Marilyn transferred $253,102.62 from two CD accounts belonging to the Weisman Estate to an account with Wells Fargo held in the name of Adam or Jason ( "CD Account 1 Transfer"). [Id. ¶ 37, Ex. F].  On December 12, 2008, Debtors transferred $150,000.00 from the Estate Account to a CD account held in the name of Adam or Jason at Wells Fargo Bank ("CD Account 2 Transfer" and collectively with the CD Account 1 Transfer, the "CD Account Transfers"). [Id. ¶ 38, Ex. G].

On March 4, 2009, Debtors transferred $190,000.00 from the Estate Account to an account for the benefit of the purchase of a home in Alpharetta, Georgia by Jason (the

3

"$190,000.00 Jason Transfer"). [Id. ¶ 39, Ex. C].   Around the same time, Debtors transferred an additional $10,000.00, possibly from the Estate Account, to Jason (the "$10,000.00 Jason Transfer" and collectively with the $190,000.00 Jason Transfer, the "Jason Transfers"). The Jason Transfers total $200,000.00. [Id. ¶ 40, Ex. C]. Jason then purchased real property on March 31, 2009 for $273,000.00. [Id. ¶ 64]. Jason paid $147,000.00 in cash towards the purchase price and obtained a mortgage for $126,000.00. [Id. ¶ 65, Ex. J].

On April 22, 2009, Debtors transferred $100,000.00 via a cash withdrawal from the Estate Account to Adam (the "$100,000.00 Adam Transfer"). [Id. ¶ 41]. Debtors transferred an additional $65,000.00 to Adam in a series of transfers from the Estate Account to an account in the name of Adam and Jason (the "$65,000.00 Adam Transfer" and collectively with the $100,000.00 Adam Transfer, the "Adam Transfers"). [Id.]. On October 26, 2009, Adam purchased real property for $157,500.00, paid with cash. [Id. ¶¶ 67, 68]. Adam subsequently sold the real property, moved to Florida with the Debtors, and purchased a new house. [Id. ¶ 42].

In total, Debtors transferred $768,102.62 to Defendants through the CD Account Transfers, Jason Transfers and Adam Transfers (collectively, the "Transfers"). [Id. ¶ 36]. At the time of the Transfers, Debtors lived with Adam and as they had no clear source of income, they paid their living expenses with a credit card issued to Adam and paid by Defendants. [Id. ¶¶ 70, 71, 72, 78, Ex. H]. Defendants paid no consideration for the CD Account Transfers. [Id. ¶ 74]. Similarly, Debtors paid no consideration for living in the home purchased through the Adam Transfers. [Id. ¶ 76]. Debtors and Adam stated they never discussed Debtors' restrictions on, or repayment of the costs incurred through the credit card. [Id. ¶ 79].

4

**Post Transfer Events**

In June 2010, Debtors closed Alilyn & Jacklp Inc. [Id. ¶ 95]. On June 21, 2011, Creditor initiated a lawsuit against Debtors for claims arising out of the Lease in the 17th Judicial Circuit in and for Broward County, Florida (Case No. CACE 11-14223). [Id. ¶ 96]. Creditor obtained a judgment against Debtors on August 2, 2011 which Creditor domesticated on July 24, 2014, in the Superior Court of Fulton County, State of Georgia (Civil Action File No. 2014CV247997). [Id. ¶¶ 97, 98]. Debtors failed to respond to post-judgment discovery requests propounded by Creditor. [Id. ¶ 102].

On September 15, 2014 (the "Petition Date"), Debtors filed a voluntary petition for relief under Chapter 7. [Id. ¶ 9]. The meeting of creditors (the "341") was held on October 21, 2014. [Id. ¶ 12]. Creditor examined Marilyn at the 341 and inquired into her father's estate, and the distribution of assets. [Id. ¶ 48]. In response to questions at the 341 Marilyn affirmed that Ben Weisman had a substantial estate and that he did not have a will [Id. ¶¶ 12, 26, 49, 50]. Plaintiff further alleges that "[t]he diversion of Debtor's [Marilyn's] assets first became known as a result of testimony at the 341". [Id. ¶ 92].

On January 29, 2015, Creditor conducted an examination of Debtors pursuant to Bankr. R. Civ. P. 2004 (the "Debtors' 2004") during which, Marilyn provided a copy of the Will. [Id. ¶¶ 13, 26, 55, and attached as Ex. H]. Marilyn has, at times, asserted she assisted her father to meet with a lawyer to make and execute a will (the "Will") leaving 50% of the Weisman Estate to Debtors' sons, Defendants. [Id. ¶¶ 57, 58]. "When questioned about the inconsistent statements regarding the existence of the Will, [Marilyn] stated she had forgotten about the existence of her father's Will." [Id. ¶ 54]. On March 4, 2015, Creditor examined Adam under

5

Bankr. R. Civ. P. 2004, who testified that he found the Will after Debtors asked him to look for it, and gave it to Debtors before Debtors' 2004. [Id. ¶¶ 14, 84].

### I. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may file a motion to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "In ruling on a 12(b)(6) motion, the court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff." *Speaker v. U.S. Dept. of Health and Human Servs. Ctrs. for Disease Control and Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010). To survive a motion to dismiss for failure to state a claim, 'heightened fact pleading of specifics' is not required; instead, a plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009). Likewise, dismissal pursuant to Fed. R. Civ. P. 12(b)(6) based on the statute of limitations "is appropriate only if it is apparent from the face of the complaint that the claim is time-barred' because '[a] statute of limitations bar is an affirmative defense and plaintiff[s] [are] not required to negate an affirmative defense in their complaint." *Lindley v. City of Birmingham, Ala.*, 515 Fed.Appx. 813, 815 (11th Cir. 2013) (quoting *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004)).

Plaintiff seeks, through the Amended Complaint, to avoid the Transfers under 11 U.S.C. § 544(b)(1) which allows a trustee to "'step into the shoes' of an unsecured creditor and void a transfer of an interest in the debtor's property that the unsecured creditor would have the

6

power to void under federal or state law." *Kipperman v. Onex Corp.*, 411 B.R. 805, 830 (N.D. Ga. 2009) (quoting *In re Int'l Pharmacy & Discount II, Inc.*, 443 F.3d 767, 770 (11th Cir. 2005)). Under Georgia law a creditor may set aside a transfer that is fraudulent as to the creditor. O.C.G.A. § 18–2–74. O.C.G.A. § 18–2–74(a)(1) provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor make the transfer or incurred the obligation: (1) With actual intent to hinder, delay, or defraud any creditor of the debtor[.]

O.C.G.A. § 18-2-74(a)(1) (2002).[1]

Absent extraordinary circumstances, trustees must bring a proceeding under § 544 within two years after the petition date. 11 U.S.C. § 546(a)(1)(A); *Citrus Tower Blvd. Imaging Ctr., LLC v. Key Equip. Fin., Inc.*, 520 B.R. 892, 905 (Bankr. N.D. Ga 2014) (Diehl, J.) (quoting *Sandvik v. U.S.*, 177 F.3d 1269, 1271 (11th Cir. 1999)); *Boudreau v. Hall Oil Co. (In re Butler Logging, Inc.)*, 538 B.R. 174, 178 (Bankr. S.D. Ga 2015) (quoting *In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 700 (11th Cir. 2005)). Defendants do not argue that Plaintiff failed to file this proceeding within two years of the Petition Date, rather they argue that 11 U.S.C. § 546 does not extend the limitations period for actions brought under O.C.G.A. § 18-2-74(a)(1) which expired prior to the Petition Date.

O.C.G.A. § 18-2-79 requires that an action under O.C.G.A. § 18–2–74(a)(1) be brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." O.C.G.A. § 18-2-79(1).

---

[1] The Georgia Uniform Fraudulent Transfers Act was revised effective July 1, 2015 as the Uniform Voidable Transactions Act and made applicable to transfers effective on or after July 1, 2015. 2015 Ga. Laws Act 167, §§ 4A-1, 7-1. Therefore, the Court will apply the former law in effect on the date of the alleged Transfers. Unless otherwise indicated, all quotations and citations will be to the law in effect at the time of the transfer.

Here, the Transfers as alleged occurred in 2008 and 2009, more than four years prior to the Petition Date. As a result, absent allegations in the Amended Complaint that would make a finding that the Transfers could not have reasonably been discovered prior to one year before the Petition Date plausible, the claims would be barred by the statute of limitations contained in O.C.G.A. § 18-2-79.

In addressing O.C.G.A. § 18-2-79, the Georgia Court of Appeals noted that a plaintiff may not be able to reasonably discover a transfer when "efforts were made to conceal some or all of the transfers from Plaintiff". *Merrill Ranch Prop., LLC v. Austell*, 336 Ga. App. 722, 733 (2016) (declining to decide and remanding the issue of 'reasonable discovery' under O.C.G.A. § 18-2-79)[2]. However, Georgia's appellate courts have not otherwise reached the "reasonable discovery" issue. *Post-Confirmation Comm. for Small Loans, Inc. v. Martin*, No. 1:13-cv-195, 2016 WL 1274127, at *8 (M.D. Ga. Mar. 31, 2016).

The majority of courts interpreting provisions similar to O.C.G.A. § 18-2-79 have held that "the one-year period runs upon the discovery of the fraudulent nature of the transfer." *Id.* (citing *Fidelity Nat'l Title Ins. Co. of N.Y. v. Howard Sav. Bank*, 436 F.3d 836, 839 (7th Cir. 2006) (interpreting Illinois law, the discovery period runs upon discovery of the wrongful injury); *Belfance v. Bushey (In re Bushey)*, 210 B.R. 95, 99 n.5 (B.A.P. 6th Cir. 1997) (Ohio "applies a discovery-of-the-fraud rule"); *Rappleye v. Rappleye*, 99 P.3d 348, 356 (Utah Ct. App. 2004); *Duran v. Henderson*, 71 S.W.3d 833, 839 (Tex. Ct. App. 2002); *Freitag v. McGhie*, 947 P.2d 1186, 1189-90 (Wash. 1997) ("Common sense and the statutory purpose of the [Uniform

---

[2] Plaintiff argues that the fraudulent concealment doctrine contained in O.C.G.A. § 9-3-96 applies here to toll the limitations period. The Court thinks this unlikely because, in enacting the Uniform Fraudulent Transfer Act (now the Uniform Voidable Transactions Act *supra* note 1) in Georgia, the General Assembly had as one of its "explicit purposes … 'to provide for statutes of limitation'". *Post-Confirmation Committee,* 2016 WL 1274127 at 7 (M.D. Ga. 2016). Further, the ruling in *Merrill Ranch* indicates that the concealment doctrine is likely included in the tolling provision of O.C.G.A. § 18-2-79 such that it is not necessary to engraft the doctrine under O.C.G.A. § 9-3-96 into § 18-2-79. In any event, given the majority rule that the limitation period only begins to run upon discovery of the fraud, the Court need not consider this argument further.

Fraudulent Transfer Act] necessitate a finding that the statute begins to run with the discovery of the fraudulent nature of the conveyance.")); *see also First State Bank of Nw. Ark. v. McClelland Qualified Pers. Residence Trust*, No. 5:14-cv-130, 2014 WL 6801803, n.7 (M.D. Ga. Dec. 2, 2014) (citing *Schmidt v. HSC, Inc.*, 319 P.3d 416, 424–29 (Haw. 2014)). Thus, it is not knowledge of the transfers that is controlling; it is knowledge that there is something "fishy" about the transfers that causes the limitations period to begin to run. *Fidelity Nat'l Title Ins. Co. of N.Y. v. Howard Sav. Bank*, 436 F.3d 836, 840 (7th Cir. 2006). With these standards in mind the Court now turns to the allegations in the Amended Complaint.

## II. LEGAL ANALYSIS

Accepting the well pleaded facts in the Amended Complaint as true, it appears that Marilyn's father, Ben Weisman, died on September 21, 2008. [Doc. 13 ¶ 22]. It is not known whether Mr. Weisman had a will and because of this uncertainty it appears as likely as not that Mr. Weisman's Estate was not probated. [Id. ¶¶ 25, 26, 49-60]. Certain of the funds from the Weisman Estate were transferred directly into Defendants' names from a Weisman Estate CD and the remainder of the funds transferred were deposited into an account in the Debtors' names. [Id. ¶¶ 32, 37, 38]. All of the Transfers occurred during the period between October 30, 2008 and July 8, 2009. [Id. ¶¶ 33, 34, 37, 38, 39, 41].

In December, 2008, Steven sent emails to Creditor that state that Debtors' business was struggling financially and Debtors might be forced to file bankruptcy. [Id. ¶ 30, Ex. D]. Debtors' business closed in June 2010 and a year later Creditor filed suit against Debtors in Florida. [Id. ¶¶ 95, 96]. Creditor obtained a judgment against Debtors on or about August 2, 2011. [Id. ¶ 97]. Thereafter, Debtors failed to respond to post-judgment discovery. [Id. ¶ 102]. Creditor questioned Marilyn at the 341 meeting about her father's estate and the distribution of

9

assets therefrom. [Id. ¶ 48]. Plaintiff also alleges that it first became aware of the Transfers as a result of testimony at the 341 meeting of creditors. [Id. ¶ 92].

Considering the allegations in the Amended Complaint which are accepted as true for purposes of the Motion, it appears that at least a portion of the funds from the Weisman Estate were never held in Debtors' names. [Id. ¶¶ 32, 35, 40]. Further, at the time the Weisman Estate funds were held in an account in the Debtors' names, Steven did not disclose these funds to Creditor, but was instead alleging serious financial difficulties and a possible bankruptcy filing. [Id. ¶¶ 30, 31]. It further appears likely that the Weisman Estate was not probated and that no discovery was conducted during the pendency of the lawsuit filed by Creditor since judgment was entered 42 days after suit was filed.[3] [Id. ¶¶ 25, 26, 49-60, 96-98]. It also appears that when discovery was undertaken Debtors failed to respond. [Id. ¶ 102]. Thus, accepting the facts alleged in the Amended Complaint as true it is plausible that Debtors, as the Response argues, concealed the Transfers and Creditor did not learn of the Transfers until at or after the 341.

The allegation in the Amended Complaint that Creditor questioned Marilyn about her father's estate at the 341 raises questions of how and when Creditor learned of the estate and what knowledge Creditor had at that time. [Doc. 24, p. 3]. Therefore, the Court concludes that the Amended Complaint alleges sufficient facts to raise questions of fact regarding whether the statute of limitations bars Plaintiff's claims.

Accordingly, it is now hereby

ORDERED that the Motion is DENIED.

**END OF ORDER**

---

[3] Defendants argue that Creditor should have discovered the Transfers through this litigation, but as indicated above, given the short time between filing suit and judgment a reasonable inference can be drawn that there was no discovery taken and further that the suit likely resulted in a default judgment. At the motion to dismiss stage the Court notes these questions of fact to be determined at trial.

## Distribution List

Howard D. Rothbloom
31 Atlanta Street
Marietta, Georgia 30060

David N. Bryman
Bryman & Clerke, P.A.
630 Village Trace
Building 15, Suite E
Marietta, GA 30067

Jordan E. Lubin
Chapter 7 Trustee
8325 Dunwoody Place, Bldg 2
Atlanta, Georgia 30350